# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

| | | |
|---|---|---|
| **GPD HOLDINGS, LLC d/b/a COINFLIP,** | ) | |
| **and CHARLES WERNICKE d/b/a** | ) | |
| **PRIVATE IT CORPORATION,** | ) | |
| | ) | **No. 3:26-cv-00284** |
| **Plaintiffs,** | ) | **District Judge Travis R. McDonough** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **GREG GONZALES, _et al._,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

### INTRODUCTION

"Virtual currency kiosks have become a gateway for scammers to exploit Tennesseans, especially our seniors, with little hope of recovering their money once it's gone[.]" Ex. A, Sexton-Reedy Press Release. The Tennessee General Assembly sought to close this gateway with the passage of Public Chapter 766, which, effective July 1, 2026, will criminalize the installation and operation of virtual currency kiosks within the state. Ex. B, 2026 Tenn. Pub. Acts 766. Plaintiffs, a virtual currency kiosk operator and a service provider, ask this Court to second-guess the legislature's policy judgment and issue a temporary restraining order to halt enforcement of the law against them. This Court should decline Plaintiffs' invitation to issue such extraordinary relief.

### BACKGROUND

"Virtual currency is an electronic medium of exchange that does not have all the attributes of real currencies." Ex. C, TDFI Memo, at *1. It includes cryptocurrency, such as Bitcoin, which does not have legal tender status and is "not issued or backed by any central bank or governmental

1

authority." *Id*. "Virtual currencies have legitimate purposes and can be purchased, sold, and exchanged with other types of virtual currencies or real currencies like the U.S. dollar." *Id*. Virtual currency can be purchased or sold on a "crypto exchange" platform by connecting a bank account for ACH transfers. Compl. ¶ 31. Such transactions can also be completed in person at a virtual currency kiosk, which "allows customers to purchase cryptocurrency with cash or sell cryptocurrency for cash." Compl. ¶ 21. To purchase cryptocurrency at a virtual currency kiosk, "the customer inserts cash into the kiosk and the cryptocurrency selected for purchase goes to the crypto wallet whose credentials the customer enters into the kiosk." *Id*. ¶ 25. When a customer sells cryptocurrency at a kiosk, the machine dispenses cash in return. *Id.* ¶ 26.

Virtual currency kiosks can be used "for a variety of lawful purposes, including purchasing digital assets, converting digital assets into cash, and sending assets to friends or family members." Compl. ¶ 32. But despite their legitimate uses, these "ATM-like devices" are increasingly being used to perpetrate fraud. Ex. D, FBI Public Service Announcement, May 15, 2026. As early as 2021, the FBI reported "an increase in scammers directing victims to use physical cryptocurrency ATMs and digital QR codes to complete payment transactions." Ex. E, FBI Public Service Announcement, November 4, 2021. The FBI explained the scammers' methods as follows:

> The scammer often requests payment from the victim and may direct the victim to withdraw money from the victim's financial accounts, such as investment or retirement accounts. The scammers provide a QR code associated with the scammer's cryptocurrency wallet for the victim to use during the transaction. The scammer then directs the victim to a physical cryptocurrency ATM to insert their money, purchase cryptocurrency, and use the provided QR code to auto-populate the recipient address. Often the scammer is in constant online communication with the victim and provides step-by-step instructions until the payment is completed.

*Id*. The FBI further explained that the "decentralized nature" of virtual currency hinders recovery efforts. *Id*. "Once a victim makes the payment, the recipient instantly owns the cryptocurrency, and often immediately transfers the funds into an account overseas." *Id*.

Evidence from other states confirms the scale of the problem. In 2023, the Iowa Attorney General's Office investigated "crypto ATM companies" after receiving complaints from citizens that they were scammed by sending money through the kiosks. Ex. F, Iowa Fact Sheet. That investigation revealed that, in less than three years, Iowa citizens lost more than $20 million in fraudulent transactions using virtual currency kiosks. *Id*. Over $13 million of those losses were facilitated by transactions through Plaintiff GPD Holdings, LLC's ("CoinFlip") kiosks, 94.92% of the transactions through CoinFlip were scam transactions, and most of the victims were over the age of 60. *Id*.

Just a few months ago, the FBI reported that, in 2025, the Internet Crime Complaint Center (IC3) "received more than 13,400 complaints reporting the use of cryptocurrency kiosks, with losses over $388 million—a 23% increase in complaints and a 58% increase in losses from 2024." Ex. D, FBI Public Service Announcement, May 15, 2026. Over half of those complaints involved victims over the age of 50, with losses of over $302 million. *Id*. And Tennesseans lost over $15 million due to scams involving these kiosks. *Id*.

Casey Cox of the Tennessee Sheriff's Association described how Tennesseans are preyed upon: scammers operating outside the United States pretend to be representatives from government agencies, tech support, romantic partners, friends or family in need of emergency funds, and others. Tennessee House of Representatives, Floor Session at 06:30-09:38 (March 11, 2026) (statement of Casey Cox). The money is almost impossible to recover and extremely difficult for Tennessee law enforcement to investigate and resolve. *Id.* Virtual currency kiosks create opportunities to get elderly victims on the phone, hook them into a scam, and walk them through the steps to deposit money into the scammer's virtual wallet. Tennessee House of Representatives, Floor Session at

09:45-11:50 (March 11, 2026) (statement of Amy Heaslet). And once the money is in a scammer's wallet, it is nearly impossible to retrieve.

To combat the fraud associated with virtual currency kiosks, House Speaker Cameron Sexton and State Representative Jay Reedy sponsored H.B. 2505, which "creates a Class A misdemeanor to own or operate a virtual currency kiosk in Tennessee." Ex. A, Sexton-Reedy Press Release. In advancing this legislation, Tennessee legislators pointed to Iowa as a leading state in fighting cryptocurrency fraud. Tennessee House of Representatives, Floor Session at 04:20-5:44 (March 11, 2026) (statement of Rep. Jay Reedy).[1] Unanimous bipartisan support led to the passage of the bill, which has been published as Public Chapter No. 766 and will be codified at Tenn. Code Ann. § 45-16-201 through -202. Ex. B, 2026 Tenn. Pub. Acts 766; Ex. G, Vote Record. The law, which takes effect on July 1, 2026, shuts the door on this category of fraud by making it a Class A misdemeanor "for a virtual currency kiosk operator or other person to knowingly install or allow installation of, permit, place, or otherwise operate a virtual currency kiosk in this state." Ex. B, 2026 Tenn. Pub. Acts 766, § 1.

Now, Plaintiffs GPD Holdings, LLC d/b/a CoinFlip, "one of the nation's largest virtual currency kiosk operators," and Charles Wernicke, "the sole employee, owner, and operator of Private IT Corporation, which provides servicing, diagnostics, technical support, and other operational services for virtual currency kiosks," claim that Public Chapter 766 is unconstitutional and seek to enjoin enforcement of the law against them. Compl. ¶¶ 4, 5, 18. They filed this lawsuit seeking declaratory and injunctive relief against Commissioner of the Tennessee Department of Financial Institutions Greg Gonzales ("Commissioner Gonzales"), Tennessee Attorney General and Reporter Jonathan Skrmetti ("General Skrmetti"), and District Attorney General for the Sixth

---

[1] https://tnga.granicus.com/player/clip/32895?view_id=775&redirect=true

4

Judicial District Charme Allen ("General Allen"). *Id*. ¶¶ 11, 15–18. Plaintiffs currently seek a temporary restraining order before July 1, 2026 to preserve the status quo while the Court considers their request for a preliminary injunction. For the reasons that follow, Plaintiffs' motion for a temporary restraining order should be denied.

## ARGUMENT

"[T]he purpose of a temporary restraining order is merely to preserve the relative positions of the parties—i.e., the status quo—until the Court can hold an adversarial hearing for a preliminary injunction." *Blount Pride, Inc. v. Desmond*, 690 F. Supp. 3d 796, 802 (E.D. Tenn. 2023) (citing *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974)). But, like a preliminary injunction, a temporary restraining order "is an extraordinary remedy which should be granted only if the movant carries [its] burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (citation omitted). To do so, the movant must show that four factors weigh heavily in its favor. That is, it must show that (1) it will likely succeed on the merits, (2) it will suffer irreparable harm in the interim, and that neither (3) the potential harm to others nor (4) the public interest counsel against temporary restraint. *Blount Pride, Inc.*, 690 F. Supp. 3d at 802 (citing *Workman v. Bredesen*, 486 F.3d 896, 905 (6th Cir. 2007)). Here, these factors weigh heavily against granting a temporary restraining order.

## I.        Plaintiffs Are Not Likely to Succeed on the Merits of Their Claims.

Plaintiffs cannot show a likelihood of success on the merits of their pre-enforcement challenge to Public Chapter 766. First, Plaintiffs cannot establish Article III standing for their claims against General Skrmetti. Similarly, those claims are barred by sovereign immunity. As for the remaining claims, Plaintiffs' allegations fall short of establishing that Public Chapter 766 is

unconstitutional. So, their request for a temporary restraining order "must fail regardless of [any] showing on the other factors." *PCC Airfoils, LLC v. Daugherty*, 176 F.4th 509, 513 (6th Cir. 2026).

### A. Plaintiffs lack standing to bring a pre-enforcement challenge against the Attorney General.

Article III of the United States Constitution "limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Safety Specialty Ins. Co. v. Genesee Cnty. Bd. of Comm'rs*, 53 F.4th 1014, 1020 (quoting U.S. Const. art. III, § 2). The "standing" doctrine "gives meaning to these constitutional limits by identifying those disputes which are appropriately resolved through the judicial process." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (internal quotation marks omitted). To have Article III standing, a "plaintiff must show (1) an injury in fact, (2) fairly traceable to the challenged conduct of the defendant, (3) that is likely to be redressed by the requested relief." *FEC v. Cruz*, 596 U.S. 289, 296 (2022) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

In a pre-enforcement challenge, the injury requirement is met only if the plaintiffs demonstrate "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Driehaus*, 573 U.S. at 159. And to establish the remaining requirements of causation and redressability, plaintiffs bringing a pre-enforcement challenge must show that each defendant "can and may take some enforcement action against them." *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1032 (6th Cir. 2022).

Here, Plaintiffs allege there is a "credible and imminent threat of criminal investigation, arrest, prosecution, and other enforcement action if they continue their intended business activities after July 1, 2026." Compl. ¶ 135. That is, as of July 1, 2026, it will be a Class A misdemeanor for Plaintiffs "to knowingly install or allow installation of, permit, place, or otherwise operate a virtual

currency kiosk in this state." Tenn. Pub. Acts 766, § 1. But they fail to show that General Skrmetti could or will take any enforcement action against them for violating this law.

Plaintiffs state that General Skrmetti "has the duty to 'defend the constitutionality and validity of all legislation of statewide applicability.'" Compl. ¶ 17 (quoting Tenn. Code Ann. § 8-6-109(b)(9)). But that is not enough to establish standing. *Nabors*, 35 F.4th at 1032. "The relevant question is not whether the Attorney General may defend the constitutionality of the statute, but whether he can prosecute plaintiffs under it." *Id.* And it is well-established that "the Tennessee Attorney General does not have the power to initiate criminal prosecutions." *Nabors*, 35 F.4th at 1032 (citing Tenn. Code Ann. § 8-6-109). That authority lies solely with district attorneys general. *Id.* (citing Tenn. Code Ann. § 8-7-103(1)). Nor does the Attorney General have "the power to direct or command district attorneys general to undertake prosecutions." *Id.* So Plaintiffs' allegation that General Skrmetti can take enforcement action "by cooperating with" district attorneys general falls short as well. *See* Compl. ¶ 17.

Finally, the fact that the Attorney General may handle any appeals from prosecution under Public Chapter 766 is immaterial. *See id.* (quoting Tenn. Code Ann. § 8-6-109(b)(2)). Put simply, "there is no imminent [enforcement action] that a federal court could coerce the Attorney General to refrain from undertaking." *Nabors*, 35 F.4th at 1032. Therefore, Plaintiffs cannot satisfy the causation and redressability requirements to establish standing for a pre-enforcement challenge against General Skrmetti.

**B.      Plaintiffs' claims against the Attorney General are barred by sovereign immunity.**

Sovereign immunity presents another insurmountable hurdle for Plaintiffs' claims against General Skrmetti. "[T]he 'Eleventh Amendment bars suits against a state or its agencies in federal court[.]'" *Skatemore, Inc. v. Whitmer*, 40 F.4th 727, 732 (6th Cir. 2022) (quoting *Brent v. Wayne*

*Cnty. Dep't of Hum. Servs.*, 901 F.3d 656, 681 (6th Cir. 2018)). This bar extends "to state officials sued in their official capacity." *Id*. (citing *Kentucky v. Graham*, 473 U.S. 159, 169 (1985)). But Eleventh Amendment immunity "is not limitless." *Id*. at 733. Relevant here, the Supreme Court in *Ex parte Young* created an exception, allowing suits against state officials to enjoin enforcement of an allegedly unconstitutional law when the official has "some connection with the enforcement of the [law]." 209 U.S. 123, 157 (1908). Thus, this exception "does not apply when a defendant state official has neither enforced nor threatened to enforce the allegedly unconstitutional state statute." *Children's Healthcare is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412, 1415 (6th Cir. 1996). As explained above, the Tennessee Attorney General has no authority to enforce Public Chapter 766. Thus, Plaintiff's pre-enforcement challenge against General Skrmetti is barred by Eleventh Amendment immunity.

> **C.      Plaintiffs are unlikely to succeed on their claims that Public Chapter 766 is unconstitutional.**

Plaintiffs allege that Public Chapter 766 (1) violates the Commerce Clause; (2) violates the Contracts Clause; (3) is void for vagueness as applied to Plaintiffs in violation of the Due Process Clause of the Fourteenth Amendment; and (4) is preempted by federal law under the Supremacy Clause. As explained below, Plaintiffs cannot show a likelihood of success on the merits of each of their claims. Therefore, their motion for a temporary restraining order should be denied.

> **1.      Public Chapter 766 does not impermissibly burden interstate commerce.**

"The Commerce Clause provides that 'Congress shall have Power ... [t]o regulate Commerce with foreign Nations, and among the several States.'" *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007) (quoting U.S. Const., art. I,

§ 8, cl. 3). "The Clause, by negative implication, restricts the States' ability to regulate interstate commerce." *Huish Detergents, Inc. v. Warren Cnty., Ky.*, 214 F.3d 707, 712 (6th Cir. 2000).

The Sixth Circuit applies a two-step test to determine whether a state law is invalid under this "dormant Commerce Clause." *Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 644 (6th Cir. 2010). The first step is to determine whether the statute "'directly regulates or discriminates against interstate commerce, or [whether] its effect is to favor in-state economic interests over out-of-state interests.'" *Id*. (quoting *Brown–Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986)) (alteration in original). If not, the court must apply the balancing test set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). *Id*.

Plaintiffs concede that Public Chapter 766 does not directly discriminate against interstate commerce and is therefore properly examined under the *Pike* balancing test. Pls' Mem. at 15–18. Under *Pike*, a state law will be upheld "unless the burden it imposes upon interstate commerce is 'clearly excessive in relation to the putative local benefits.'" *Int'l Dairy Foods Ass'n*, 622 F.3d at 644 (quoting *Pike*, 397 U.S. at 142). The *Pike* test controls when state regulation is neither extraterritorial nor discriminatory in effect. *Id.* Courts must weigh the legitimacy of the local benefit, the extent of the burden on interstate commerce, and the availability of nondiscriminatory alternatives. *Id.*

A plurality of four Justices in *National Pork Producers Council v. Ross* concluded that a challenger must plead facts plausibly showing substantial burdens on interstate commerce before a court will engage in *Pike* balancing at all. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 383 (2023). The Sixth Circuit applied this heightened threshold in *Truesdell v. Friedlander*, holding that a challenger must show substantial harm to interstate commerce—not merely harm to specific firms—before *Pike* balancing is triggered. 80 F.4th 762, 768 (2023).

Consumer protection is a well-recognized legitimate local interest under *Pike* balancing. The Sixth Circuit upheld a Tennessee retail prohibition in *LensCrafters, Inc. v. Robinson* based on the state's interest in protecting healthcare professionals from commercial influences. *LensCrafters, Inc. v. Robinson*, 403 F.3d 798 (6th Cir. 2005). In *LensCrafters*, the law prohibited optometrists from practicing in or in conjunction with any retail store or commercial establishment where merchandise is displayed or offered for sale. *Id.* at 709. The public policy rationale arose out of the nexus between two otherwise legal concepts: the practice of optometry and retail of the attendant merchandise. In applying the *Pike* balancing test, the court found that the burdens imposed on interstate commerce were not clearly excessive in relation to the state's interest in preventing commercial interference with the conduct of licensed medical professionals. *Id.* at 805–06.

And in *Tennessee Scrap Recyclers Association v. Bredesen*, the Sixth Circuit upheld a Memphis ordinance requiring scrap metal dealers to hold purchased metal for ten days to allow law enforcement to inspect it for stolen goods, finding that the consumer protection and anti-theft rationale provided demonstrable independent value as a law enforcement device and that the mere existence of the regulation deterred criminal activity. *Tennessee Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442 (2009).

Public Chapter 766 presents an even stronger consumer protection case. The nexus between two otherwise legal services, ATMs and cryptocurrency, is ripe for fraud. Ex. D, FBI Public Service Announcement, May 15, 2026; Ex. F, Iowa Fact Sheet. And the nature of the fraud makes it difficult for law enforcement to police this conduct after the fact; prevention of the fraud is a useful law enforcement mechanism. Tennessee House of Representatives, Floor Session at 06:30-09:38 (March 11, 2026) (statement of Casey Cox). The General Assembly has found that these

10

kiosks are used predominantly for scams. Ex. A, Sexton-Reedy Press Release; Ex. F, Iowa Fact Sheet. The local benefit is substantial and directly tied to the State's interest in protecting Tennesseans from fraud.

The burden side of the *Pike* balance requires a showing of substantial harm to interstate commerce generally—not merely to specific firms or to the structure of a particular market. *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117 (1978); *Truesdell*, 80 F.4th at 768. The legislation here eliminates a specific category of financial technology device from the Tennessee market; it does not impinge on the markets for cryptocurrency as a whole. Pls' Mem. 8–9.

And the Supreme Court in *National Pork Producers Council v. Ross* unanimously rejected an "almost per se" rule against laws with extraterritorial effects, but a plurality of Justices (Gorsuch, Thomas, Sotomayor, and Kagan) concluded that challengers must plead substantial burdens on interstate commerce before *Pike* balancing applies. 598 U.S. at 375. The plurality "cautioned against judges using the dormant Commerce Clause as 'a roving license for federal courts to decide what activities are appropriate for state and local government to undertake.'" *Id*. (quoting *United Haulers Ass'n, Inc.*, 550 U.S. at 343).

At this stage, the Court should "focus ultimately on the regulatory purposes identified by the lawmakers and on the evidence before or available to them that might have supported their judgment." *LensCrafters, Inc. v. Wadley*, 248 F. Supp. 2d 705, 738 (M.D. Tenn. 2003), *amended in part* (Feb. 26, 2003), *aff'd sub nom. LensCrafters, Inc. v. Robinson*, 403 F.3d 798 (6th Cir. 2005) (quoting *Kassel v. Consol. Freightways Corp. of Delaware*, 450 U.S. 662, 680 (1981)). The question for this part of the test is whether the lawmakers could rationally have believed that the challenged regulation would advance its stated goals. *Id.* And that is clearly the case here:

11

foreclosing kiosks that lawmakers identified as being used for fraud and scams in over 90% of cases advances the protection of Tennessee consumers, particularly the elderly.

Plaintiffs claim the law is "underinclusive because it targets one financial channel—virtual currency kiosks—while leaving untouched bank withdrawals, ATMs, gift cards, wire services, online cryptocurrency platforms, online banking, and fintech applications." Mot. 9-10. Thus, the illegal conduct will flow to other channels that "remain legal and often less regulated." Id. But this undercuts their claim that Public Chapter 766 has a dramatic impact on interstate commerce since consumers can access Bitcoin and other crypto currencies through these other avenues. Regardless, fraud in those channels is already illegal and capable of being investigated.. *See, e.g.,* Tenn. Code Ann. § 39-14-103 (theft); Tenn. Code Ann. § 39-14-112 (extortion); Tenn. Code Ann. § 39-14-115 (criminal simulation); Tenn. Code Ann. § 39-14-118 (illegal possession or fraudulent use of a credit or debit card); Tenn. Code Ann. § 39-14-127 (deceptive business practices); Tenn. Code Ann. § 39-15-150 (identity theft); Tenn. Code Ann. § 39-14-601 *et seq*. (the Tennessee Personal and Commercial Computer Act of 2003); Tenn. Code Ann. § 39-14-901 (the Money Laundering Act of 1996); Tenn. Code Ann. § 39-15-502 (financial exploitation of an elderly or vulnerable person). Public Chapter 766 does not operate absent these provisions—it operates in conjunction with them.

What lawmakers have identified as the public policy rationale of Public Chapter 766— echoing law enforcement and the banking industry—is that these kiosks are *particularly* prone to exploitation and *particularly* difficult to investigate and prosecute. That distinction comes down to what Plaintiffs highlight as the core feature of the kiosks—the ability to exchange cash for crypto outside the banking system. Compl. at ¶¶ 5-7, 17, 27–29, 30, 153, 158; Mem. at 2-3, 8, 20. And the safety measures Plaintiffs point to in defense of the kiosks are all measures that are or can

be employed in any other type of transaction involving cryptocurrency, especially when those transactions are linked to the banking system.

### 2. Public Chapter 766 does not unconstitutionally impair Plaintiff's contractual obligations.

The Contracts Clause of the U.S. Constitution provides that "[n]o state shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const., art. I, § 10, cl. 1. Although this language "is facially absolute," the Clause's "prohibition must be accommodated to the inherent police power of the State 'to safeguard the vital interests of its people.'" *Energy Rsrvs. Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 410 (1983) (citing *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 434 (1934)). Put differently, the Clause "does not operate to obliterate the police power of the States." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 241 (1978).

To determine whether a law violates the Contracts Clause, the initial inquiry is whether the law "has, in fact, operated as a substantial impairment of a contractual relationship." *Id*. at 244. If so, the inquiry turns to the means and ends of the legislation. *Ashley Sveen v. Kaye Melin*, 584 U.S. 811, 819 (2018). That is, the State "must have a significant and legitimate public purpose behind the regulation, such as the remedying of a broad and general social or economic problem." *Energy Rsrvs. Grp., Inc.*, 459 U.S. at 411–12 (internal citation omitted). This "guarantees that the State is exercising its police power, rather than providing a benefit to special interests." *Id*. at 412. "Once a legitimate public purpose has been identified," the final step is to determine "whether the adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.'" *Id*. (quoting *U.S. Tr. Co. of New York v. New Jersey*, 431 U.S. 1, 22 (1977)).

Even though Plaintiffs allege Public Chapter 766 impairs their contractual relationships, Pls' Mem. at 19, the extent of that alleged impairment is diminished by the fact that Plaintiffs

operate in a heavily regulated industry. *Energy Rsrvs. Grp., Inc.*, 459 U.S. at 411 ("In determining the extent of the impairment, [courts] are to consider whether the industry the complaining party has entered has been regulated in the past."). Money transmission activities within the State are heavily regulated under the Tennessee Money Transmission Modernization Act, Tenn. Code Ann. § 45-7-101 *et seq*. *See* Compl. ¶ 58. Likewise, virtual currency businesses are subject to extensive federal oversight under the Bank Secrecy Act, the USA PATRIOT Act, and FinCEN regulations. *See* Compl. ¶¶ 41; 56; 270–71. Thus, Plaintiffs could not reasonably expect their private contracts to be protected from impairment in such a heavily regulated area of operation. *Hudson Water Co. v. McCarter*, 209 U.S. 349, 357 (1908) ("One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them.").

Even if Public Chapter 766 constitutes a substantial impairment, the law serves a significant and legitimate public purpose. The law aims to protect Tennesseans, especially the elderly, from falling victim to fraud. Yet Plaintiffs contend that the law "is not reasonably tailored to the asserted anti-fraud objective." Pls' Mem. at 20. They argue that the State "could have addressed the asserted risk through licensing, transaction limits, warnings, cooling-off periods, reporting, refund procedures, KYC/AML controls, training, and recordkeeping requirements, all without rendering Plaintiffs' existing contracts impossible to perform." *Id*.

But CoinFlip already implements many of these measures, Pls' Mem. at 18, and despite doing so, an investigation by the Iowa Attorney General's Office revealed that Iowans lost over 13 million dollars in transactions through CoinFlip's ATMs, nearly 95% of transactions carried out on CoinFlip's platform were scams, and most of the victims were over the age of 60. *See* Ex. F, Iowa Fact Sheet. Therefore, the anti-fraud measures proposed by Plaintiffs are strikingly ineffective to address the State's concerns. So the Tennessee General Assembly concluded that the

14

only appropriate measure was a complete ban on virtual currency kiosks. And "[a]s is customary in reviewing economic and social regulation, . . . courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *U.S. Tr. Co. of New York*, 431 U.S. at 22–23. For these reasons, Plaintiffs are unlikely to succeed on their claim under the Contracts Clause.

### 3. Public Chapter 766 is not unconstitutionally vague.

"The Due Process Clauses of the Fifth and Fourteenth Amendments provide the constitutional foundation for the void-for-vagueness doctrine." *Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553, 556 (6th Cir. 1999). The doctrine has two goals: "(1) to ensure fair notice to the citizenry and (2) to provide standards for enforcement by police, judges, and juries." *Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio*, 502 F.3d 545, 551 (6th Cir. 2007). Fair notice requires that "laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). And "laws must provide explicit standards for those who apply them" to avoid "arbitrary and discriminatory enforcement." *Id*. Public Chapter 766 satisfies both standards.

Public Chapter 766 makes it a Class A misdemeanor "for a virtual currency kiosk operator or other person to knowingly install or allow installation of, permit, place, or otherwise operate a virtual currency kiosk in this state." Tenn. Pub. Acts 766, § 1. The Act defines "virtual currency kiosk operator," "person," "virtual currency kiosk," and "electronic terminal." *Id*. Plaintiffs complain that the Act does *not* define the operative verbs, "install," "permit," "place," or "operate." But the absence of provisions defining those verbs is not sufficient to render the law unconstitutionally vague. *Columbia Nat. Res., Inc. v. Tatum*, 58 F.3d 1101, 1108 (6th Cir. 1995) ("The statute need not define with mathematical precision the conduct forbidden"). Undefined

terms must simply be given their "ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012) (citation omitted).

Plaintiffs also argue that the verbs are ambiguous as applied to certain aspects of their operations. Pls' Mem. at 21–22. Mr. Wernicke's business includes servicing, diagnostics, technical support, and other operational services for virtual currency kiosks located in Tennessee and around the country, which entails transporting, storing, servicing, conducting test transactions on, and reinstalling components of such kiosks. Pls' Mem. at 22. He claims that he "is unable to determine from the text of [Public Chapter 766] whether returning a component to its kiosk 'installs' it, doing test transactions, software checks, or other work necessary to restore a kiosk to, or keep it in, working condition 'operates' it, holding a kiosk or its component at his facility 'places' it, or transporting a kiosk component through or into Tennessee 'permits' it in the State, in violation of that Act." *Id*. CoinFlip claims to face similar uncertainty regarding the verbs "permit" and "place" because its business requires kiosks to be transported, serviced, and stored throughout the country, including Tennessee. *Id*. at 23. But "statutes are not unconstitutionally vague 'simply because difficulty is found in determining whether certain marginal offenses fall within their language.'" *Doe v. Rausch*, 461 F. Supp. 3d 747, 776 (E.D. Tenn. 2020) (quoting *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963)).

Based on the above, Plaintiffs are unlikely to succeed on their claim that Public Chapter 766 is unconstitutionally vague.

### 4.     Public Chapter 766 is not preempted by federal law.

"The Supremacy Clause of the United States Constitution provides in relevant part that federal law 'shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.'" *Fenner v. Gen. Motors, LLC*, 113 F.4th 585, 593 (6th

Cir. 2024) (quoting U.S. Const. art. VI, cl. 2). Thus, "[w]hen state and federal laws clash, federal law reigns supreme and state law is preempted." *McDaniel v. Upsher-Smith Lab'ys, Inc.*, 893 F.3d 941, 944 (6th Cir. 2018). There are three different types of federal preemption: (1) express preemption; (2) field preemption; and (3) conflict preemption. Plaintiffs bring their pre-enforcement challenge under the third type. Compl. ¶ 287; Pls' Mem. at 24–25.

Conflict preemption exists when "it is impossible to comply with both federal and state law, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417, 425 (6th Cir. 2000) (quoting *Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 562–63 (6th Cir. 1998)). Plaintiffs claim that Public Chapter 766 "obstructs the federal framework governing money services businesses ("MSBs"), including virtual currency kiosk operators." Pls' Mem. at 24. Specifically, Plaintiffs provide that "Congress and FinCEN regulate MSBs through the Bank Secrecy Act ("BSA"), which requires registration, anti-money-laundering programs, transaction monitoring, recordkeeping, suspicious-activity reporting, currency-transaction reporting, and law-enforcement access." *Id*. (citing 31 U.S.C. §§ 5311, 5330; 31 C.F.R. §§ 1022.210, 1022.310, 1022.320, 1022.380). Plaintiffs claim that because Congress chose to regulate rather than prohibit virtual currency kiosks, Tennessee may only supplement that framework by imposing stricter regulations. *Id*. at 25. But Tennessee's prohibition does not make compliance with federal law impossible. Nor does it stand as an obstacle to the federal regulation of MSBs.

Virtual currency kiosks operators can comply with both Tennessee law and federal registration, monitoring, and reporting requirements because the federal obligations arise only when reportable transactions occur. Put differently, Tennessee law regulates whether virtual currency kiosks may operate, while federal law regulates the conduct of the operator when such

17

operations exist. So, simultaneous compliance is possible. For the same reasons, Tennessee's prohibition of virtual currency kiosks does not stand as an obstacle to the purposes of the BSA and related federal regulations.

If the purpose of the federal law is to address risks associated with virtual currency kiosks, Tennessee's prohibition of those kiosks simply removes any federal need to detect unlawful activity. Both can coexist. A federal regulatory scheme does not prohibit states from adopting more protective consumer measures. See *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 793 ("But federal regulation of certain activities does not mean that States must authorize activities antecedent to those federally regulated. For example, federal regulation of nuclear powerplants does not demand that States allow the construction of such powerplants in the first place.") (J. Ginsburg concurring). For these reasons, Plaintiffs are unlikely to succeed on the merits of their federal preemption claim.

## II.     A Temporary Restraining Order Would Cause Harm to the State and its Citizens.

The third and fourth factors for consideration—harm to others and the public interest— "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Because Plaintiffs are unlikely to succeed on the merits of their constitutional challenges, these factors counsel against enjoining enforcement of the challenged law. "'[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'" *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)). Similarly, "giving effect to the will of the people by enforcing the laws they and their representatives enact serves the public interest." *Thompson v. Dewine*, 959 F.3d 804, 812 (6th Cir.

18

2020) (citing *Coal. to Def. Affirmative Action v. Granholm*, 473 F.3d 237, 252 (6th Cir. 2006)). Thus, the final two factors weigh heavily against enjoining enforcement of Public Chapter 766.

**III.     Plaintiffs Cannot Establish an Irreparable Harm.**

As the Iowa investigation revealed, nearly 95% of transactions through CoinFlip's kiosks were scam transactions. Ex. F, Iowa Fact Sheet. Because CoinFlip's revenue comes from transaction fees, the loss of revenue from processing fraudulent transactions cannot constitute irreparable harm. Similarly, Mr. Wernicke cannot claim irreparable harm from being prohibited from servicing these kiosks that perpetrate fraudulent transactions.

**CONCLUSION**

Plaintiffs' Motion for a Temporary Restraining Order should be denied.

Respectfully submitted,

JONATHAN SKRMETTI
Attorney General and Reporter

/s/ *Samantha P. Morris*
SAMANTHA P. MORRIS, BPR# 038178
JOHN W. AYERS, BPR# 037494
HUNTER C. KNIGHT, BPR# 036084
Assistant Attorneys General
Law Enforcement and
Special Prosecutions Division
P.O. Box 20207
Nashville, Tennessee 37202-0207
(615) 741-4469
Samantha.Morris@ag.tn.gov
Will.Ayers@ag.tn.gov
Hunter.Knight@ag.tn.gov
*Counsel for Defendants*

19