| | | |
|---|---|---|
| GPD HOLDINGS, LLC d/b/a COINFLIP<br>and CHARLES WERNICKE d/b/a<br>PRIVATE IT CORPORATION, | )<br>)<br>) | Case No. 3:26-cv-284 |
| | ) | |
| *Plaintiffs*, | ) | Judge Travis R. McDonough |
| | ) | |
| v. | ) | Magistrate Judge Debra C. Poplin |
| | ) | |
| GREG GONZALES, in his official<br>capacity as Commissioner of Tennessee<br>Department of Financial Institutions,<br>JONATHAN SKRMETTI, in his official<br>capacity as Attorney General and Report of<br>Tennessee, and CHARME ALLEN, in her<br>official capacity as District Attorney<br>General for the 6th Judicial District, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
| | ) | |
| *Defendants*. | ) | |

## MEMORANDUM AND ORDER

Before the Court is Plaintiffs GPD Holdings, LLC d/b/a/ CoinFlip ("CoinFlip") and

Charles Wernicke d/b/a Private IT Corporation's ("Wernicke") motion for a temporary

restraining order (Doc. 8). For the following reasons, the Court will **DENY** Plaintiffs' motion.

## I.      BACKGROUND

This case concerns virtual-currency kiosks, also known as crypto ATMs, bitcoin ATMs,

or BTMs. On March 16, 2026, Tennessee passed House Bill 2505 ("H.B. 2505"), which makes

it a Class A misdemeanor for any person "to knowingly install or allow installation of, permit,

place, or otherwise operate a virtual currency kiosk in this state." H.B. 2505, 114th Gen.

Assemb., 2026 Sess. (Tenn. 2026). This law is due to take effect on July 1, 2026. (*Id*.)

CoinFlip is one of the largest virtual-currency-kiosk operators in the United States that "conducts business across nearly every state, the District of Columbia, and Puerto Rico." (Doc. 8-2, at 2.) CoinFlip "maintains contractual relationships with approximately 58 Tennessee businesses that host CoinFlip virtual-currency kiosks in 85 Tennessee locations." (*Id*. at 3.) According to CoinFlip's CEO, Ben Weiss, CoinFlip's customers "choose kiosks because they want to use cash, lack convenient access to traditional banking products, are underbanked, or do not want to link bank credentials to an online exchange." (*Id*. at 7.) CoinFlip understands that H.B. 2505 "prohibits the continued operation of its Tennessee virtual-currency kiosks after July 1, 2026," which will result in lost revenue, termination of existing host-location agreements, discontinued customer relationships, and abandoned market opportunities. (*Id*. at 3.) As Weiss explains, in connection with its Tennessee operations, CoinFlip entered host-location agreements with numerous Tennessee businesses for placement of its kiosks, which include terms regarding maintenance, revenue sharing, customer access, and removal coordination. (*Id.* at 4.) Weiss also generally avers that, if kiosks are removed from host locations, "customers will migrate to alternative services, host-location partners will enter into new commercial agreements, and business opportunities [CoinFlip] developed through years of investment may be permanently lost." (*Id*. at 5.) CoinFlip insists that it will not intentionally violate Tennessee criminal law and, therefore, anticipates incurring significant costs to remove its kiosks in Tennessee as well as costs associated with terminating or modifying existing contractual relationships. (*Id*. at 5–6.)

Wernicke lives in Knoxville, Tennessee, and "provides servicing, diagnostics, technical support, and other operational services for virtual-currency kiosks located throughout Tennessee and the United States." (Doc. 8-3, at 1–2.) Wernicke avers that, although he is not a retail kiosk operator, he maintains inventory, equipment, vehicles, and other operational assets in Tennessee,

including "nine operable virtual-currency kiosks in its non-public facility for documentation, testing, demonstration, and service of kiosk components." (*Id*. at 3.) Wernicke also has an annual contract with General Bytes USA, LLC to provide support for virtual-currency-kiosk systems used by operators in Tennessee and elsewhere. (*Id*. at 3–4.) According to Wernicke, H.B. 2505 "creates uncertainty about whether [his business] can continue servicing, storing, testing, shipping, installing, repairing, or supporting virtual-currency kiosks in Tennessee." (*Id*. at 4.) Wernicke further avers that if H.B. 2505 takes effect he may be forced to cease or substantially curtail his operations in Tennessee, resulting in lost work, customer relationships, and goodwill he has built over time. (*Id*. at 5.)

CoinFlip and Wernicke initiated this action on June 17, 2026, asserting claims against: (1) Greg Gonzales, in his official capacity as Commissioner of the Tennessee Department of Financial Institutions; (2) Jonathan Skrmetti, in his official capacity as Attorney General and Reporter of Tennessee; and (3) Charme Allen, in her official capacity as District Attorney General for the 6th Judicial District of Tennessee. (Doc. 1.) In their complaint, they assert claims under 42 U.S.C. § 1983 for violations of their rights under the United States Constitution, including claims for violations of the dormant Commerce Clause, the Contracts Clause, and the Due Process Clause. (Doc. 1, at 26, 37, 40, 43.) CoinFlip and Wernicke have also moved for a temporary restraining order, arguing that H.B. 2505 is unconstitutional and requesting that the Court enjoin H.B. 2505 from taking effect on July 1, 2026. (Doc. 8.) The State of Tennessee entered an appearance on behalf of all Defendants and filed a response opposing the motion for temporary restraining order on June 23, 2026 (Doc. 15). Defendants' opposition attached evidence regarding how virtual-currency kiosks can be used to facilitate fraud and scams, including: (1) a press release from the Tennessee House Republican Caucus regarding passage

3

of H.B. 2505 (Doc. 15-1); (2) a memorandum from the Tennessee Department of Financial Institutions (Doc. 15-3); (3) Federal Bureau of Investigation Public Service Announcements (Docs. 15-4, 15-5); (4) a Fact Sheet published by the Iowa Department of Justice (Doc. 15-6); and (5) a summary of the legislative history of H.B. 2505 (Doc. 15-7). Additionally, Defendants rely on a recording of the House Commerce Committee's hearing on March 11, 2026, which includes testimony of a sheriff and a representative from Tennessee's Banker's Association about how virtual-currency kiosks are predominantly used to facilitate scams. *Hearing on H.B. 2505 Before the H. Commerce Comm.*, 114th General Assembly (Tenn. March 11, 2026). During this hearing, Tennessee House Representative Jay Reedy testified that virtual-currency kiosks "allow fast, hard to trace transfers of money" and that a study by Iowa's Attorney General found that a majority of these transactions involved fraud. *Id.* Defendants also provided a supplement to the FBI's Internet Crime Complaint Center's 2025 Annual Report that reports that Tennesseans lost more than $15 million in 2025 to scams involving a virtual-currency kiosk. (Doc. 15-4, at 4–5.) Currently, this fraud purportedly took place despite "multiple fraud-prevention and consumer-protection controls" already in place in virtual-currency kiosks. (Doc. 8-2, at 2.)

On June 25, 2026, the Court held a hearing on Plaintiffs' motion for a temporary restraining order ("TRO"), at which the Court heard additional argument. Neither party presented additional evidence at the hearing.

## II.     STANDARD OF LAW

The purpose of a temporary restraining order is to preserve and maintain the status quo for a short period of time "so that a reasoned resolution of a dispute may be had." *Proctor & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 226 (6th Cir. 1996). When reviewing motions

for TROs, courts must consider the following: (1) the movant's likelihood of success on the merits; (2) whether the movant will suffer irreparable injury without an injunction; (3) whether granting the injunction would cause substantial harm to others; and (4) whether the public interest would be served by granting the injunction. *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012) (citing *Am. Imaging Svcs., Inc. v. Eagle-Picher Indus., Inc.*, 963 F.2d 855, 858 (6th Cir. 1992)); *see also Midwest Retailer Associated, Ltd. v. City of Toled*o, 563 F. Supp. 2d 796, 802 (N.D. Ohio 2008) ("The same standard generally applies to the issuance of temporary restraining orders and preliminary injunctions."). These considerations are "factors to be balanced and not prerequisites that must be satisfied" before relief may issue. *Eagle-Picher*, 963 F.2d at 859. Nor are they "rigid and unbending requirements"; rather, "[t]hese factors simply guide the discretion of the court." *Id*. "[W]here there is no likelihood of either success on the merits or irreparable harm, an injunction is unwarranted—regardless of the showing on the other factors." *James B. Oswald Co. v. Neate*, 98 F.4th 666, 672 (6th Cir. 2024) (citation modified).

The party seeking injunctive relief bears the burden of justifying such relief. *EOG Res., Inc. v. Lucky Land Mgmt., LLC*, 134 F.4th 868, 885 (6th Cir. 2025). Injunctive relief is "an extraordinary remedy never awarded as of right." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Rather, it "should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

## III. ANALYSIS

### A. Standing

Defendants first argue that the Court should deny Plaintiffs' motion for temporary restraining order to the extent they have sued Attorney General Skrmetti because they do not have standing. (Doc. 15, at 5.) Article III, Section 2 requires that a plaintiff have standing to

5

sue.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  To have standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Daunt v. Benson*, 956 F.3d 396, 417 (6th Cir. 2020) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).  An injury, for standing purposes, means the "invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent.'"  *Id.* (citing *Lujan*, 504 U.S. at 560).  "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'"  *Spokeo*, 578 U.S. at 339.  A "concrete" injury in fact does not have to be tangible, but it must be "'real,' and not 'abstract.'"  *Id.*  Further, "where plaintiffs seek to establish standing based on an imminent injury, the Supreme Court has explained that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that 'allegations of *possible* future injury' are not sufficient."  *Galaria v. Nationwide Mut. Ins. Co.*, 663 F. App'x 384, 388 (6th Cir. 2016) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphasis in original) (citation modified)).

> To show an "imminent future injury" in a pre-enforcement challenge (such as this one), a plaintiff must establish four requirements: (1) an intention to engage in a course of conduct that is (2) arguably affected with a constitutional interest but (3) is proscribed by a statute, and (4) that there is a credible threat of prosecution under the statute.

*McKee Foods Corp. v. BFP Inc.*, 173 F.4th 242, 258 (6th Cir. 2026) (quoting *Yoder v. Bowen*, 146 F.4th 516, 522 (6th Cir. 2025).

> [P]laintiffs show a credible threat of enforcement where they allege a subjective chill *and* point to some combination of the following four factors:  (1) a history of past enforcement; (2) receipt of enforcement warning letters regarding their specific conduct; (3) an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action; and (4) whether the defendant has disavowed enforcement of the challenged statute against a particular plaintiff.  A plaintiff need not satisfy all the *McKay* factors to establish a credible threat.

6

*Yoder*, 146 F.4th at 524–25 (citation modified).

A plaintiff seeking an anti-enforcement injunction does not have standing to sue an individual who has no ability to take an enforcement action against the plaintiff. *See Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1032 (6th Cir. 2022). In *Universal Life Church*, the Sixth Circuit held that plaintiffs did not have standing to sue Tennessee's Attorney General because he "does not have the power to initiate criminal prosecutions." 35 F.4th at 1032. Rather, "[i]t's the *district* attorneys general . . . that actually initiate criminal enforcement proceedings[,]" and neither the Tennessee Constitution nor the statutory duties of the Attorney General, Tenn. Code Ann. § 8-6-109, say "that the Attorney General has the power to direct or command district attorneys general to undertake prosecutions." *Id.* (citing Tenn. Const. art. IV; Tenn. Code Ann. §8-6-109).

Here, Plaintiffs seek an anti-enforcement injunction against Attorney General Skrmetti to prevent him from enforcing H.B. 2505 against Plaintiffs. (Doc. 1, at 50.) As the Tennessee Attorney General, however, he does not have the power to initiate criminal prosecutions or to direct or command district attorneys to undertake prosecutions. Therefore, Plaintiffs lack standing to sue Attorney General Skrmetti.[1]

**B.      Temporary Restraining Order Factors**

---

[1] It is unclear whether Plaintiffs have standing as it relates to Commissioner Gonzales or District Attorney Allen, but the parties have not briefed the Court on this matter. To have standing to sue related to an anti-enforcement injunction, a party needs to demonstrate that there "is a credible threat of prosecution." *McKee Foods Corp.*, 173 F.4th at 258 (listing the four *McKay* factors to establish a credible threat). Plaintiffs have not provided evidence to show that they face a credible threat of prosecution. As explained below, however, the Court is denying Plaintiffs' motion for TRO based on its analysis of the governing TRO factors. Nothing in this opinion, however, should be construed as the Court determining whether Plaintiffs have standing as it relates to Commissioner Gonzales or District Attorney Allen.

7

Even assuming Plaintiffs could demonstrate standing related to the temporary injunctive relief they seek, they have not met their burden to demonstrate that issuance of a temporary restraining order is appropriate based on the limited evidentiary record currently before the Court.

### 1. *Likelihood of Success*

#### a. Dormant Commerce Clause

Article I of the Constitution vests Congress with the power to "regulate Commerce . . . among the several States[.]" U.S. Const., art. I, § 8, cl. 3. Although the Commerce Clause does not explicitly restrain States, there is a "negative implication" of the Commerce Clause, which is known as the "dormant Commerce Clause." *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337 (2008). This negative implication "prohibits the enforcement of state laws driven by economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023).

"Under the resulting protocol for dormant Commerce Clause analysis, we ask whether a challenged law discriminates against interstate commerce." *Dep't of Revenue of Ky.*, 553 U.S. at 337. In this context, "'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Sys., Inc. v. Dep't of Env't Quality of State of Oregon*, 511 U.S. 93, 99 (1994). "[I]f a state law discriminates against out-of-state goods or nonresident economic actors, the law can be sustained only on a showing that it is narrowly tailored to advance a legitimate local purpose." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 518 (2019) (citation modified).

"By contrast, nondiscriminatory regulations that have only incidental effects on interstate commerce are valid unless the burden imposed on such commerce is 'clearly excessive in

relation to the putative local benefits.'" *Oregon Waste Sys., Inc.*, 511 U.S. at 99 (*quoting Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)). "Alleging a substantial burden on interstate commerce is a threshold requirement that plaintiffs must satisfy before courts need even engage in *Pike*'s balancing and tailoring analyses." *Nat'l Pork Producers Council*, 598 U.S. at 393 (2023) (Sotomayor, J., concurring). The Supreme Court has held that there is a substantial burden on interstate commerce when a State's regulation impedes the flow of interstate commerce. *See id.* at 379 n.2, 392.

"State laws frequently survive [] *Pike* scrutiny[.]" *Dep't of Revenue of Ky.*, 553 U.S. at 339; *Nat'l Pork Producers Council*, 598 U.S. at 390 ("Preventing state officials from enforcing a democratically adopted state law in the name of the dormant Commerce Clause is a matter of 'extreme delicacy,' something courts should do only 'where the infraction is clear.'"). The dormant Commerce Clause does not foreclose a State from banning a "particular structure or methods of operation in a retail market." *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 127 (1978) (holding that Maryland's law that banned producers of petroleum products from operating service stations within the State was not discriminatory and did not impermissibly burden interstate commerce). States are within their powers to pass laws that protect consumers in their state. *See LensCrafters, Inc. v. Robinson*, 403 F.3d 798, 803 (6th Cir. 2005).

During the hearing on their motion, Plaintiffs agreed that H.B. 2505 does not facially discriminate between in-state and out-of-state economic interests. As a result, the Court must determine whether the evidence before it demonstrates that H.B. 2505 nevertheless inflicts a substantial burden on interstate commerce and, if so, whether that substantial burden is clearly excessive relative to any putative local benefit.

9

Plaintiffs argue that H.B. 2505 inflicts substantial harm on interstate commerce because it prohibits Tennesseans from using virtual-currency kiosks to buy and sell virtual-currencies, noting that when "Tennessee customers use CoinFlip's kiosks, they exchange cash for cryptocurrency by means of CoinFlip's out-of-state cryptocurrency holdings, software infrastructure, servers, and transaction-processing systems." (Doc. 10, at 15.) Plaintiffs' evidence regarding the burden on interstate commerce, however, is notably sparse. In fact, the only evidence regarding the burden on interstate commerce is Weiss's averment that "[b]ecause Tennessee sits at the center of CoinFlip's national kiosk network, H.B. 2505 will disrupt interstate business operations, logistics planning, vendor relationships, and service arrangements beyond Tennessee itself and affecting kiosks and business activities in other states." (Doc. 8-2, at 7.) Even presuming the H.B. 2505 applies Wernicke and his business, his evidence is even more lacking; he only avers that his business provides services for kiosks located in Tennessee and the United States. (Doc. 8-3, at 2–3.) Such general averments are insufficient to support a finding that H.B. 2505 inflicts substantial harm on interstate commerce. Moreover, Plaintiffs cite no support for the proposition that a state's ban of a service involved in interstate commerce necessarily creates a substantial burden on interstate commerce. Based on the limited evidentiary record before the Court, Plaintiffs have not met their burden of demonstrating a likelihood that they will succeed in demonstrating that H.B. 2505 substantially burdens interstate commerce.

Additionally, even assuming Plaintiffs could demonstrate a substantial burden on interstate commerce, they have not demonstrated that they are likely to succeed in demonstrating that such a burden is clearly excessive relative to the putative local benefits. During the Tennessee House hearing, legislators heard testimony regarding how virtual-currency kiosks

10

have been used to facilitate fraud and scams in Tennessee. *Hearing on H.B. 2505 Before the H. Commerce Comm.*, 114th General Assembly (Tenn. March 11, 2026). Specifically, House Representative Reedy testified that results from a study conducted by the Iowa Attorney General "results showed that 96%[2] of the transactions [conducted at virtual-currency kiosks] were fraud" and that most of the victims were over the age of 60. *Id.* The House Commerce Committee then heard testimony from two individuals—a sheriff and a representative from the Tennessee Banker's Association. *Id.* The sheriff testified that Tennessee law enforcement is "increasingly encountering [virtual-currency kiosks] in connection with fraud schemes that target our most vulnerable citizens, especially our senior citizens," that the money sent by these virtual-currency kiosks are "almost impossible to recover," and that these cases are hard to investigate and resolve. *Id.* Defendants included the Iowa Attorney General's report about virtual-currency kiosks that they claim is the report relied on by Representative Reedy. (Doc. 15-6.) In that report, the Iowa Attorney General states that it subpoenaed virtual-currency kiosk companies for information on Iowans who made transactions through their kiosks. (*Id.*) The Iowa Attorney General's office then "called and emailed hundreds of Iowans who had made transactions through crypto ATMs." (*Id.*) During its investigation, the Iowa Attorney General discovered that 94.92% of money Iowans reported sending through CoinFlip were scam transactions and that most victims were over the age of 60. (*Id.*) The House Commerce Committee testimonies regarding H.B. 2505 echo the results of the Iowa Attorney General report and that these sorts of scams are also prevalent in Tennessee. *Hearing on H.B. 2505 Before the H. Commerce Comm.*, 114th General Assembly (Tenn. March 11, 2026).

---

[2] The Iowa Attorney General report provided to the Court does not explicitly use this percentage, but it states that Iowans reported that 98% of their transactions through Bitcoin Depot and 94% of their transactions on CoinFlip were scam transactions. (Doc. 15-6.)

Additional evidence supplied by Defendants lends further support to this concern.  The FBI's Internet Crime Complaint Center 2025 annual report indicates that Tennesseans lost more than $15,000,000 due to frauds that involved virtual-currency kiosks—the fourth highest percentage nationally based on relative population.  (*See* Doc. 15-4.)  Evidence indicating that Tennesseans are at a higher risk of fraud through the use of virtual-currency kiosks strongly suggests that there is a local benefit to H.B. 2505.  Although Plaintiffs may be correct that regulating the kiosks would be less burdensome than banning them outright, they have not shown that the burden is clearly excessive in relation to the local benefit.  Accordingly, Plaintiffs have not shown they are likely to succeed on the merits for their dormant Commerce Clause claim.

b. <u>Contracts Clause</u>

The Contracts Clause "provides that no state shall pass any Law impairing the Obligation of Contracts." *Ashley Sveen v. Kaye Melin*, 584 U.S. 811, 818 (2018) (citation modified) (quoting U.S. Const., art. I, § 10, cl. 1).  "[T]he Clause applies to any kind of contract." *Id.* (citation omitted).  However, "not all laws affecting pre-existing contracts violate the Clause." *Id.* at 819.  "[I]t is to be accepted as a commonplace that the Contract Clause does not operate to obliterate the police power of the States." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 241 (1978).

To determine if a law violates the Contracts Clause, courts apply a two-step test. *Ashley Sveen*, 584 U.S. at 819.  "The threshold issue is whether the state law has operated as a substantial impairment of a contractual relationship." *Id.* (citation modified).  To answer that question, the Court considers the extent to which the law:  (1) "undermines the contractual bargain"; (2) "interferes with a party's reasonable expectations"; and (3) "prevents the party from safeguarding or reinstating his rights." *Id.*  "If such factors show a substantial impairment,

12

the inquiry turns to the means and ends of the legislation." *Id.* The Court will ask "whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" *Id.* "When the impaired contract is between private parties normally, [courts] defer to the State's judgment as to the necessity and reasonableness of a measure." *Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307, 323 (6th Cir. 1998) (citation modified).

Both CoinFlip and Wernicke aver that H.B. 2505 will impair their contracts regarding virtual-currency kiosks and that some of those agreements extend past July 1, 2026—after H.B. 2505 goes into effect. (Docs. 8-2, at 4–5; 8-3, at 3–4.) Plaintiffs, however, have not provided the Court with any of these contracts or any specific details of these contracts.

Nonetheless, even assuming that H.B. 2505 will substantially impair Plaintiffs' contracts, they have not met their burden of demonstrating that the Tennessee legislature acted unreasonably or that H.B. 2505 does not advance a significant and legitimate public purpose. As stated in *supra* Section III.B.1.a., the Tennessee's legislature was troubled by the prevalence of scams that involved virtual-currency kiosks and cited a report that over 90% of transactions that involved virtual-currency kiosks were scams. *Hearing on H.B. 2505 Before the H. Commerce Comm.*, 114th General Assembly (Tenn. March 11, 2026). Also, according to the FBI data cited by Defendants, Tennesseans have suffered more loss from scams involving virtual-currency kiosks than most other States in the nation. The State has a significant public interest in helping stop fraud against its citizens. And, since Plaintiffs' contracts are with other private entities and not the State, the Court "defer[s] to the State's judgment as to the necessity and reasonableness" of the ban against virtual-currency kiosks. *Toledo Area AFL-CIO Council*, 154 F.3d at 323. Considering that current anti-fraud measures have still led Tennesseans to suffer some of the

13

most significant losses due to fraud involving virtual-currency kiosks, a ban of these kiosks appears reasonable and appropriate based on the limited evidence presently before the Court. Accordingly, Plaintiffs have not demonstrated that they are likely to succeed on their claim that H.B. 2505 violates the Contacts Clause of the United States Constitution.

c.      <u>Due Process</u>

"The due process clause of the Constitution provides the foundation for the void for vagueness doctrine." *Columbia Nat. Res., Inc. v. Tatum*, 58 F.3d 1101, 1104 (6th Cir. 1995).

> It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.

*Id*. at 1105 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972)).

To succeed on a vagueness claim, a plaintiff must prove that a statute: (1) "fail[s] to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits or (2) authorize[s] or even encourage[s] arbitrary and discriminatory enforcement." *Platt v. Bd. of Comm'r on Grievances & Discipline of Ohio Supreme Ct.*, 894 F.3d 235, 246 (6th Cir. 2018) (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)). Courts must first "examine the words of the [statute] itself" to determine whether the law "provides sufficient notice to a person of ordinary intelligence[.]" *Id.* (citation modified). "[W]hen the common meaning of a word provides adequate notice of the prohibited conduct, the statute's failure to define the term will not render the statute void for vagueness." *Id.* at 247. Courts, however, "have struck down statutes that tied criminal culpability to whether the defendant's conduct was 'annoying' or

14

'indecent'—wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *United States v. Williams*, 553 U.S. 285, 306 (2008). Additionally, "[L]aws that include criminal prohibitions typically require a higher level of specificity than purely civil laws." *Tennessee Educ. Ass'n v. Reynolds*, 732 F. Supp. 3d 783, 806 (M.D. Tenn. 2024) (citing *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489 (1982)).

H.B. 2505 makes it a Class A misdemeanor to "to knowingly install or allow installation of, permit, place, or otherwise operate a virtual currency kiosk in this state." H.B. 2505, 114th Gen. Assemb., 2026 Sess. (Tenn. 2026). Plaintiffs argue that the words "install," "permit," "place," and "operate" are vague and make it hard for them to know if certain conduct violates the statute. (Doc. 10, at 21.) These words, however, do not rely on "wholly subjective judgments" like the words "annoying" or "indecent," but are verbs with common meanings. Additionally, the contested verbs' meanings are even more clear when one reads those verbs in the context of the statute. For example, Plaintiffs contend that it is unclear "whether retuning a kiosk component to its kiosk 'installs' it[.]" (Doc. 10, at 22.) The verbs "install or allow installation of" precede the noun "virtual currency kiosk," which is a defined term in the statute, and clearly does not mean a component of a kiosk but the kiosk as a whole. The other verbs can similarly be understood to apply to a kiosk as a whole. Additionally, the word "kiosk" itself is not an ambiguous term, rather, it is commonly understood to be a structure that others may approach for services. *Kiosk*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/kiosk?src=search-dict-hed (last visited June 30, 2026). Taking the common meaning of the verbs in the context of the statute as a whole, Plaintiffs have failed to demonstrate that they are likely to succeed on their claim that H.B. 2505 violates the due process clause because it is void for vagueness.

The Supremacy Clause provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof, are the supreme Law of the Land . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (quoting U.S. Const., art. VI, cl. 2).  There are three different ways "federal statutes may displace state law[:]"  express preemption, field preemption, and conflict preemption.  *Id.*  Plaintiffs assert that various federal statutes displace H.B. 2505 under the doctrine of conflict preemption.  (Doc. 10, at 24–25.)

"Conflict preemption exists where (1) it is impossible for a private party to comply with both state and federal law, and (2) the state law is an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Yates v. Ortho-McNeil-Janssen Pharms., Inc.*, 808 F.3d 281, 294 (6th Cir. 2015) (citation modified).  "[T]he Supreme Court has cautioned that analyzing obstacle preemption 'does not justify a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives,' which 'would undercut the principle that it is Congress rather than the courts that pre-empts state law.'"  *Dayton Power & Light Co. v. FERC,* 126 F.4th 1107, 1128 (6th Cir. 2026) (quoting *United States v. Whiting*, 563 U.S. 582, 607 (2011)).  "[F]inding obstacle preemption requires meeting a high threshold."  *Id.* (citation modified).

Plaintiff contends that H.B. 2505 is preempted by 31 U.S.C. §§ 5311, 5330; 31 C.F.R. §§ 1022.210, 1022.320, 1022.380 because it is "an obstacle to the purposes of the [Bank Secrecy Act] and related federal regulations."  (Doc. 10, at 24–25.)  Plaintiffs, however, have failed to demonstrate that H.B. 2505 creates an obstacle to the accomplishment of federal laws.  Title 31 U.S.C. § 5311 states that its purpose is to:  "require certain reports or records" that are useful in criminal investigations; prevent money laundering "through the establishment by financial

institutions of reasonably designed risk-based programs"; "facilitate the tracking of money"; "assess the money laundering . . . and fraud risks to financial institutions, products, or services"; and "establish appropriate frameworks for information sharing".  Tennessee's ban on virtual-currency kiosks does not create an obstacle to the purposes and objectives of this statute.  Section 5311 is concerned with gathering information and sharing such information to help combat money laundering and fraud.  Tennessee's ban does not prohibit a company involved in money transactions from complying with § 5311; it bans one method of achieving cryptocurrency transactions.  The other methods for buying and selling cryptocurrency will still be required to adhere to this federal statute.

Similarly, H.B. 2505's ban on virtual-currency kiosks does not create an obstacle to the other federal statutes and regulations cited by Plaintiffs.  Title 31 U.S.C. § 5330 requires registration of money-transmitting businesses and even states that "[b]usinesses remain subject to State law."  31 U.S.C. § 5330(a)(3).  Supporting regulations also belie any conflict:  31 C.F.R. § 1022.210 requires money-services businesses to have anti-money laundering programs; 31 C.F.R. § 1022.320 regulates reporting by money-services businesses of suspicious transactions; and 31 C.F.R. § 1022.380 requires registration of money-services businesses.  If an entity is a money-services business or money-transmitting business, it can still register, report suspicious activity, and implement anti-money laundering programs without violating H.B. 2505.  To the extent Plaintiffs engage in a money-services business or money-transmitting business, nothing about H.B. 2505 precludes future compliance with federal reporting and anti-money laundering requirements.  To the extent they are foreclosed from engaging in their preferred money-services business or money-transmitting business because of H.B. 2505, they are no longer under an obligation to comply with federal reporting and anti-money laundering requirements.  As a

17

result, there is no evidence of a conflict between state and federal laws, and Plaintiffs' preemption arguments are not likely to succeed.[3]

### 2.    *Remaining TRO Factors*

A plaintiff seeking a temporary restraining order must "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22 (stating that a "possibility" of irreparable harm is not enough to be granted a preliminary injunction).  "An injury is irreparable if it is not 'fully compensable by monetary damages." *S. Glazer's Distributors of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 852 (6th Cir. 2017) (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012).  When the government opposes the issuance of a temporary restraining order, the final two factors—the balance of equities and the public interest—typically merge because the government's interest is the public interest.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

Although Plaintiffs have established their businesses will suffer harm, that consideration must be balanced with public interest and equities, which militate in favor of denying injunctive relief.  H.B. 2505 was "passed through the ordinary democratic process" and "represents the legislature's judgment that enforcement of the statute is in the public interest." *Tri-Cnty. Wholesale Distributors, Inc. v. Wine Grp., Inc.*, 565 F. App'x 477, 483–84 (6th Cir. 2012) (citing *Golden Gate Rest. Ass'n v. City and Cnty. of San Francisco*, 512 F.3d 1112, 127 (9th Cir. 2008); 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 2948.4 (2d. ed. 2012) ("The public interest also may be declared in the form of a statute")).  Specifically, Tennessee legislatures were concerned with the prevalence of scams involved in virtual-currency

---

[3] Finding that Plaintiffs have failed to meet their burden of demonstrating that their claims are likely to succeed, "an injunction is unwarranted—regardless of the showing on the other factors." *EOG Res., Inc.*, 134 F.4th at 885.

18

kiosks and the difficulties investigating such scams that involved such kiosks. *Hearing on H.B. 2505 Before the H. Commerce Comm.*, 114th General Assembly (Tenn. March 11, 2026). Weighing the remaining factors, this Court finds that they do not support a temporary injunction.

## IV.    CONCLUSION

Based on the limited evidentiary record before the Court, the Court finds that Plaintiffs have not met their burden of demonstrating that temporary injunctive relief is appropriate. Accordingly, the Court **DENIES** Plaintiffs' motion for a TRO (Doc. 8).

**SO ORDERED.**

/s/ *Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**

19